## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ROBERT C. KAUFHOLD,** *et al.*, | Civ. No. 2:11-cv-01460 (WJM) |
| **Plaintiffs,** | |
| v. | **OPINION** |
| **GERALD CAIAFA,** *et al.*, | |
| **Defendants.** | |

<u>**WILLIAM J. MARTINI, U.S.D.J.**</u>:

Plaintiffs Robert C. Kaufhold and Joseph Aurthur McGuckin were the guitarist and drummer of the iconic punk rock band, the Misfits. Plaintiffs filed this action against the band's bassist, Gerald Caiafa, and his music label, Cyclopian Music, Inc. ("Cyclopian") (collectively "Defendants"), alleging that Defendants improperly asserted exclusive ownership rights over the Misfits trademarks. This matter comes before the Court on Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendants' motion to dismiss is **DENIED**.

### I.    BACKGROUND

The following facts are drawn from the Amended Complaint.

The Misfits was a punk rock band formed in 1977. The band is known for pioneering and defining the musical genre of "horror punk," combining the themes, imagery, and narrative of horror fiction with punk rock music. During all relevant times, the Misfits had four members: a guitarist, a drummer, a bass player, and a vocalist. Plaintiff Kaufhold was the Misfits' guitarist from approximately November 1978 to approximately October 1980, and performed under the name Bobby Steele. Plaintiff McGuckin was the Misfits' drummer and performed under the name Arthur Googy from approximately April 1979 to approximately April 1982. McGuckin was the longest serving drummer in the band. Defendant Caiafa joined the band in 1977 as a replacement for the original bass player Diane DiPiazza, and performed under the name Jerry Only.

Glenn Anzalone p/k/a Glenn Danzig ("Danzig"), the band's vocalist, is not a party to this action.

The band's primary recording period was from 1978 to 1982 (Plaintiffs refer to this as the band's "classic period"). Am. Compl. ¶ 18, ECF No. 7. During this period, the band performed under the name the "Misfits" and used certain logos and stylized versions of that name (the "Misfits Marks"), which distinctively identified their services to the public. Although the Misfits disbanded in 1983, classic-period Misfits recordings continue to be sold today. For the past 15 years, Plaintiffs have received, and continue to receive, royalties for their work on the Misfits recordings.

For 12 years after the breakup of the Misfits, between 1983 and 1995, there was no group that toured or recorded as the Misfits. The Amended Complaint alleges that, during these 12 years, Defendant Caiafa publicly rejected his association with the Misfits and the Misfits Marks. The Amended Complaint further alleges that, from 1983 through 1995, Plaintiff Kaufhold was the only member of the band to use the Misfits Marks. Kaufhold alleges that he used the Misfits Marks from 1983 to the present on flyers, posters, and advertisements. From 1988 through 1992, Kaufhold sold the Misfits Live '79 record (which prominently features the Misfits trademark) at shows for his band the Undead. Kaufhold continues to sell the Misfits Live '79 album to this day from his website. Immediately after his departure from the Misfits, and continuing through today, Kaufhold played and recorded Misfits songs in concert, and even recorded a 12 song album of Misfits songs entitled "12 Hits From Hell." Kaufhold also sold Misfits branded t-shirts from the time he exited the band.

In 1994, a settlement agreement was executed between Defendant Caiafa and other former members of the Misfits ("1994 Settlement"). Plaintiffs were not parties to the 1994 Settlement. However, after the settlement was reached, Caiafa allegedly informed Plaintiffs that the parties to the settlement had agreed that each of the former members of the band (including Plaintiffs) co-owned the Misfits Marks, and no member would apply for exclusive rights to use the Misfits Marks. In 1995, a second settlement agreement was executed ("1995 Settlement"), wherein the parties agreed to allow Caiafa to apply for the exclusive right to use the Misfits Marks. Plaintiffs were not parties to the 1995 Settlement, and Caiafa did not tell Plaintiffs about the 1995 Settlement.

In 1996, the Misfits Box Set was released, containing nearly all of the band's classic-period material recorded from 1977 to 1983. The release of the box set in 1996 made the Misfits' complete early catalog widely available for the first time. Also around 1996, Caiafa recruited new band members and began to tour as the Misfits (referred to here as the "new Misfits").[1] The new Misfits did a 25th Anniversary Tour and a 30th

---

[1] From 2001 through 2005 Caiafa took over lead vocal duties in addition to playing bass guitar, and recruited veteran musicians Dez Cadena, former guitarist of Black Flag, and Marky Ramone,

Anniversary Tour.  The new Misfits also released albums in 1997, 1999, and 2003.  None of these albums cracked the Billboard Record charts top 100.  Defendants Caiafa and Cyclopian sold and continue to sell merchandise with the Misfits Marks.

Beginning in approximately October 2000, without the knowledge of the Plaintiffs, Caiafa and Cyclopian filed five applications with the U.S. Patent and Trademark Office ("PTO") to register the Misfits Marks, three of which have matured into trademark registrations.  In applying for registration, Caiafa represented that Cyclopian was the owner of the Marks, and that, to the best of his knowledge and belief, no other person had the right to use the Marks in commerce.  The Amended Complaint alleges that, at the time he made those representations, Caiafa knew that Kaufhold had senior rights to the Marks and made those representations with the intent to deceive the PTO.

Plaintiffs assert that they were completely unaware of the trademark applications as well as the exploitation of the Misfits Marks by Defendants.  It was not until August of 2009 that Plaintiff McGuckin saw a billboard in New York City for Van's sneakers with the Misfits Marks that he had any indication that the Misfits Marks were being exploited other than in the continued record sales.  McGuckin proceeded to research the improper use of the Misfits Marks, notifying Kaufhold of the extent of their use sometime in the early part of 2010.  On June 11, 2010, Plaintiffs filed an action against Defendants in the Southern District of New York.  *See Kaufhold, et al. v. Cyclopian et al.*, No. 1:10-cv-04588, 2010 WL 5094630, at *2 (S.D.N.Y. Dec. 14, 2010).  In an Opinion and Order dated December 14, 2010, the Honorable Denise Cote granted Defendants' motion to dismiss that action, finding that the Southern District lacked personal jurisdiction over Defendants.  *Id.* at *5.

On March 15, 2011, Plaintiffs filed a complaint in this Court.  On June 22, 2011, Plaintiffs filed the Amended Complaint at issue here.  In the Amended Complaint, Plaintiffs assert three causes of action: (1) trademark infringement under 15 U.S.C. § 1125(a); (2) cancellation of Defendants' trademark registrations based on fraudulent procurement; and (3) declaratory judgments that Plaintiffs co-own the Misfits Marks and that Defendants' trademark applications are based on Caiafa's fraudulent claims to the PTO.  Defendants now move to dismiss the Amended Complaint in its entirety.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated.  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  In deciding a motion to dismiss under

---

former drummer of the Ramones.

Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 129 S.Ct. at 1949 (2009).

## III.    DISCUSSION

Defendants move to dismiss the Amended Complaint on two grounds: (1) the doctrine of laches, and (2) failure to state a claim under the Lanham Act. Each issue will be addressed in turn.

### a.  THE DOCTRINE OF LACHES

Defendants assert that Counts I and III of the Amended Complaint are barred by the doctrine of laches.[2] Because the laches defense depends on disputed factual issues, the motion to dismiss based on the laches defense is denied as premature.

Because the Lanham Act does not include a specific statute of limitations, the Third Circuit has found that laches applies to bar stale claims. *Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). Under Third Circuit law, the doctrine of laches bars a Lanham Act claim when there is "(1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *Id.*

---

[2] Defendants initially argued that all of Plaintiffs' claims were time-barred under the doctrine of laches. Defs.' Br. at 9. However, Defendants appear to acknowledge in their reply brief that the remedy of laches does not apply to Count II (Cancellation of U.S. Trademark Registrations). *See* Defs.' Reply Br. at 6 n.2. Indeed, it is well-settled in the Third Circuit and elsewhere that the defense of laches is not available for a claim for cancellation based on fraudulent procurement. *Marshak v. Treadwell*, 240 F.3d 184, 192-94 (3d. Cir. 2001) (according to the Supreme Court, the PTO, and the plain language of the statute, a fraudulent procurement claim may be asserted at any time); *see also* 15 U.S.C. § 1064(3).

"Inexcusable delay" for purposes of laches is measured by looking to "the most analogous" state statute of limitations. *Santana*, 401 F.3d at 135. Claims under the Lanham Act are properly analogized to New Jersey's six year fraud statute. *See Zinn v. Seruga*, No. 05-372, 2009 WL 3128353, at *24 (D.N.J. Sep. 28, 2009); N.J.S.A. § 2A:14-1. It is the law in this Circuit that, "[o]nce the statute of limitations has expired, the defendant 'enjoys the benefit of a presumption of inexcusable delay and prejudice.'" *Santana*, 401 F.3d at 138-39 (quoting *EEOC v. The Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984)). When this presumption applies, the burden shifts to the plaintiff to prove that its delay in bringing the claim was excusable, and that the delay did not prejudice the defendant. *See Santana*, 401 F.3d at 138-39.

Plaintiffs do not dispute that Defendants are entitled to the presumption of delay and prejudice in this case. Instead, Plaintiffs argue that "Defendants are barred from asserting the equitable claim of latches [sic] based on their own inequitable conduct." Pls.' Opp. Br. at 12. Plaintiffs are correct that, "[w]here there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied." *See A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992).

Plaintiffs argue that it would be inequitable to recognize the defense of laches in this case for two reasons. First, Plaintiffs argue that the defense is barred by the doctrine of unclean hands because Defendants' own actions caused the delay. *See Intertech Licensing Corp. v. Brown & Share Mfg. Co., Inc.*, 708 F.Supp. 1423, 1429 (D. Del. 1989) (A plaintiff may overcome a presumption of laches when "the one asserting the defense of laches was responsible for the plaintiff's delay"). Specifically, Plaintiffs allege that Caiafa told them that no member of the band would apply for exclusive rights to use the Misfits Marks after the 1994 Settlement, and then misleadingly failed to tell them, only one year later, when the other former band members agreed to let Caiafa apply for exclusive rights to use the Marks. Second, Plaintiffs argue that Defendants' submission of a fraudulent PTO application operates to bar the defense of laches. *See Merisant Co. v. McNeil Nutritionals, LLC*, 515 F.Supp.2d 509, 523 (E.D. Pa. 2007).

Ruling on Defendants' laches defense at this stage would be premature. "[W]hen the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." *Solow Bldg. Co., LLC v. Nine West Group, Inc.*, No. 00-7685, 2001 WL 736794, *3 (S.D.N.Y. June 29, 2001). However, when the defense of laches depends on disputed facts, it is inappropriate to make a determination on a motion to dismiss. *See Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances*, 723 F.2d 357, 363 (3d Cir. 1983) (dismissal on the basis of laches was inappropriate when the defense depended on "disputed issues of fact."); *Fannie v. Chamberlain Mfg. Corp., Derry Div.*, 445 F. Supp. 65, 75 (W.D. Pa. 1977) (denying

laches defense in a motion to dismiss as "premature" because there were open "questions of fact").

With respect to the laches defense in this case, the only issue in dispute is whether there was inequitable conduct on the part of Defendants. The facts underlying inequitable conduct are heavily disputed. For example, the parties dispute whether Caiafa's failure to inform Plaintiffs of the 1995 Settlement constituted bad faith, whether Kaufhold was using the Marks continuously after leaving the band, whether Defendants were aware of Kaufhold's use of the Marks, whether Defendants acted with intent to deceive the PTO when they applied for the Marks, etc. Moreover, these disputed facts go to the heart of the merits of the case. As such, dismissal on the basis of laches at this stage of the litigation would be inappropriate.

Accordingly, the motion to dismiss Counts I and III based on the defense of laches is denied as premature. Defendants may re-raise the defense at a later stage of litigation.

## b.  FAILURE TO STATE A CLAIM UNDER THE LANHAM ACT

Defendants argue that all of Plaintiffs' Lanham Act claims fail as a matter of law because Plaintiffs have not alleged continuous use in commerce of the Misfits Marks. The Court disagrees.

Defendants are correct that each Count in the Amended Complaint requires Plaintiffs to allege use of the Marks in commerce. Counts I and III require a showing that Plaintiffs own the Marks. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (to state a claim for trademark infringement under 15 U.S.C. § 1125(a), a plaintiff must establish, among other things, that he owns the mark); Am. Compl. ¶ 98 ("Plaintiffs seek a declaratory judgment that they are, at the very least, co-owners of the *Misfits* Marks"). To establish ownership, a plaintiff must plead (among other things) that he has used the mark continuously in commerce. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991) ("[T]he first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce"). Similarly, Count II, cancellation on the basis of fraudulent procurement, requires Plaintiffs to show (among other things) that they have an actual commercial interest in the Marks. *See Kelly v. Duprees MJA, LLC*, No. 08-6046, 2012 WL 1019473, at *4 (D.N.J. Mar. 23, 2012) ("To have the requisite standing [to bring a cancellation claim], a party must demonstrate a real and rational basis for his belief that he would be damaged by the registration sought to be cancelled, stemming from an actual commercial or pecuniary interest in his own mark"); *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed.Cir. 1984).

The Amended Complaint contains numerous factual allegations that support Plaintiffs' claim of continuous commercial use of the Marks. The Amended Complaint

alleges that classic-period Misfits recordings featuring Plaintiffs have been sold throughout the relevant time period (from 1978 to the present). Am. Compl. ¶¶ 25-27, 32-33, 57. The Amended Complaint further alleges that Plaintiffs have been receiving, and continue to receive, royalties for their work on these recordings. Am. Compl. ¶¶ 25, 56. It is well-settled in this Circuit that receiving royalties for previously recorded material constitutes commercial use of a trademark. *See Marshak v. Treadwell*, 240 F.3d 184, 200 (3d Cir. 2001) ("[T]he commercial exploitation of classic . . . recordings in this country constitutes use"); *Kelly v. Estate of Arnone ex rel. Ahern*, No. 08-6046, 2009 WL 2392108, at *6 (D.N.J. Aug. 3, 2009) (holding that a band member "continue[d] to receive royalties and, therefore, ha[d] an ongoing commercial interest in the mark," especially because "albums featuring [the band member] continue[d] to be marketed online and in stores"); *see also Kingsmen v. K-Tel Int'l, Ltd.*, 557 F. Supp. 178, 183 (S.D.N.Y. 1983) ("[T]he fact that these individuals continue to receive royalties for [their] recordings" establishes commercial use of the mark "[e]ven though plaintiffs disbanded their group in 1967").

Moreover, the Amended Complaint contains a litany of allegations regarding Kaufhold's commercial use of the Marks. For example, the Amended Complaint alleges that: (1) Kaufhold used the Misfits Marks on flyers, posters, and advertisements from 1983 to the present (Am. Compl. ¶ 31); (2) Kaufhold sold the Misfits Live '79 album featuring Misfits Marks from 1988 through 1992 (Am. Compl. ¶ 32); (3) Kaufhold continues to sell the Misfits Live '79 album from his website (Am. Compl. ¶ 33); (4) Kaufhold has played and recorded Misfits songs in concert since his departure from the band (Am. Compl. ¶ 34); (5) Kaufhold recorded a 12 song album of Misfits songs titled "12 Hits From Hell" (Am. Compl. ¶ 34); and (6) Kaufhold sold Misfits branded t-shirts from the time he exited the band (Am. Compl. ¶ 37).

Based on these factual allegations, the Court finds that Plaintiffs have sufficiently alleged continuous use in commerce of the Misfits Marks. Accordingly, the motion to dismiss Plaintiffs' Lanham Act claims is denied.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **DENIED**. An appropriate order follows.


_____
/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**


**Date: May 31, 2012**

7